UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| JOYCINTH V. JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:09cv284 WCL |
| | ) | |
| A.W. HOLDINGS, LLC., | ) | |
| a/k/a ANTHONY WAYNE SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendant,

A.W. Holdings, LLC, a/k/a Anthony Wayne Services ("AWS"), on July 26, 2010.  The plaintiff,

Joycinth V. Jones ("Jones"), filed her response on October 22, 2010, to which AWS replied on

November 16, 2010.

For the following reasons, the motion for summary judgment will be granted.

Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  However, Rule 56(c) is not a requirement that the moving party negate his

opponent's claim.  Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir.

1990).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery,

against a party "who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and in which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The standard for granting summary

judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. In Re Matter of Wildman, 859 F.2d 553, 557 (7th Cir. 1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir. 1988); Valentine v. Joliet Township High School District No. 204, 802 F.2d 981, 986 (7th Cir. 1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir. 1992)(quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, Celotex, 477 U.S. at 323. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir. 1988); Guenin v. Sendra Corp., 700 F. Supp. 973, 974 (N.D. Ind. 1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960 (1983).

So that the district court may readily determine whether genuine issues of material fact exist, under Local Rule 56.1, the moving party is obligated to file with the court a "Statement of Material Facts" supported by appropriate citation to the record to which the moving party

contends no genuine issues exist. In addition, the non-movant is obligated to file with the court a "Statement of Genuine Issues" supported by appropriate citation to the record outlining all material facts to which the non-movant contends exist that must be litigated. See, Waldridge v. American Hoechst Corp. et al., 24 F.3d 918 (7th Cir. 1994). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Id. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252. Finally, the court notes that, "[i]t is a gratuitous

cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.  <u>Mason v. Continental Illinois Nat'l Bank</u>, 704 F.2d 361, 367 (7th Cir. 1983).

<u>Discussion</u>

Jones attended college in Jamaica and obtained a Masters Degree in social psychology from Wheaton College in Illinois in 1985. (Dep. of Jones at p. 6). She also received a graduate level certificate in substance abuse counseling. Thereafter, she performed doctoral level course work at Pace University. (Dep. of Jones at p. 7). She also took courses in clinical psychology at Walden University while studying for a Ph.D. (Id.).

Jones has owned her own business, Child and Family Resources, for approximately six years. She does counseling at group homes in Fort Wayne through that business. (Dep. of Jones at pp. 9-10).

While working as a behavioral clinician for Your Friends and Neighbors, Jones learned that AWS was seeking to add behavioral clinicians. (Dep. of Jones at pp. 17-18). Sometime in January or February, 2007, Jones had a telephone conversation with AWS Director Tom Titus ("Titus"), who informed Jones that AWS was looking to add more clinicians. Titus asked Jones to send him her resume. (Dep. of Jones at p. 18).

Jones was eventually interviewed by Karen Shollenberger ("Shollenberger"). (Dep. of Jones at p. 20). There was a discussion as to the manner in which Jones would be compensated as a behavioral clinician. Either Titus or Shollenberger told Jones that she would be paid somewhere between 83% and 87% of whatever Medicaid paid for behavioral services for a particular client. (Dep. of Jones at pp. 21-22).

4

It was Jones' understanding that based upon her prior training and education, she would be working in conjunction with a psychiatrist or psychologist at AWS. (Dep. of Jones at p. 24). Jones further understood that she would be compensated based upon the percentage of monies received for the work she performed for AWS. (Dep. of Jones at p. 24). There were no discussions as to the hours Jones would work. (Id.).

In May, 2007, Jones received her first referral from AWS. (Dep. of Jones at pp. 29-30). Titus made the referral to Jones. (Dep. of Jones at p. 30). Jones received three or four additional referrals between May and September, 2007. (Dep. of Jones at p. 31). On those referrals, Jones was paid by check from AWS. There were no deductions made for taxes or any other withholdings. (Dep. of Jones at p. 33).

On September 11, 2007, Jones was presented with an Independent Contractor Agreement by Titus. Jones agrees that she had an opportunity to review the Independent Contractor Agreement prior to signing it. (Dep. of Jones at pp. 36-37). Jones acknowledges that the Agreement provides that she was not considered an employee of AWS. (Dep. of Jones at pp. 37-38). Jones received IRS-1099 forms.

The Agreement provides, in part, as follows:

Whereas Joycinth Jones hereinafter referred to as "Independent Contractor." Whereas AWS desires to enter into an agreement with Joycinth Jones for the provisions of behavioral service to clients of AWS.

RECITALS:

1.    AWS is engaged in the business of providing a broad range of services to children and adults with disabilities, and
2.    Independent Contractor would like to provide behavior management services for individuals; develop and monitor positive behavior support plans and behavioral data, and train direct care staff in plan implementation, in accordance with DDRS 460 regulations.

3.      AWS desires to engage the services of Independent Contractor in accordance with the terms and conditions set forth below.

Therefore, in consideration of the mutual covenants contained herein, the parties agree as follows:

1.      ENGAGEMENT:

Independent Contractor agrees to provide services to AWS, pursuant to the terms and conditions hereof. Such services shall extend until the agreement is terminated by either party.

2.      PAYMENT AGREEMENT:

AWS agrees to pay Independent Contractor 82% of a client's monthly BMAN rate, as identified on the clients NOA, for completion of Independent Contractor responsibilities. AWS agrees to pay the Independent Contractor on a monthly basis, when a billing statement for completed work has been provided. Billing statements provided no later than 9:00am on Wednesday's, will be paid on Friday. Submissions received after 9:00am on Wednesday of any week, will be paid on the following Friday.

3.      INDEPENDENT CONTRACTOR:

Independent Contractor will act at all times under this agreement as an independent contractor. AWS will not exercise control or discretion over the manner or methods by which Independent Contractor provides services and otherwise performs its obligations. Independent Contractor agrees to perform and render the services in accordance with any specific terms, conditions or requirements, as may be established by AWS.

4.      NO EMPLOYMENT:

Independent Contractor and AWS acknowledge and agree that the terms and conditions of this agreement do not constitute an agreement of employment. Independent Contractor is not and shall not be considered an employee of AWS.

* * * *

6.      TERMINATION:
This agreement is in force September 11, 2007 and will be on-going unless terminated by either party in writing. Both parties may alter no conditions of the agreement without written approval. Either party may cancel this agreement upon 30-day notice, without penalty or further obligation to the other party. In addition,

AWS may terminate this agreement for "good cause" and without notice in the event of any material violation of AWS policy. (Dep. of Jones, Exhibit A)

After signing the contract, Jones met with a Level I psychologist at AWS, Dr. Scott Salon ("Dr. Salon"), who was to be her supervisor. (Dep. of Jones at p. 39). When Jones met with Dr. Salon in September, 2007, Dr. Salon informed her that the format on some of Jones' paperwork was unacceptable, and she should look at forms that other behavioral clinicians used. (Dep. of Jones at pp. 39-40). Specifically, Dr. Salon told Jones that she could speak with Michelle, another contracted behavioral clinician. Michelle provided Jones with copies of the AWS forms in December, 2007. (Dep. of Jones at pp. 52-53). Titus also provided Jones with forms in December, 2007. (Dep. of Jones at p. 53).

On February 4, 2008, AWS exercised its right under the Agreement to terminate the independent contractor arrangement with Jones. Titus sent Jones a letter on that date which reads as follows:

It is the decision of AWS to terminate the independent contractor agreement for behavioral services with you, at this time. Per the agreement, AWS is giving you a 30-day notice of termination. Please notify your clients and their families of this decision, so that as little disruption for them occurs as possible. (Dep. of Jones, Exhibit C).

Jones performed services for the next 30 days. She was paid the agreed upon percentage for the services provided. (Dep. of Jones at pp. 47-48).

Jones subsequently filed a Charge of Discrimination with the EEOC in which she alleged she was discriminated against by AWS because of her national origin (Jamaican), race (African American), and color (black). (Dep. of Jones, Exhibit D). Jones alleges that because of her minority status she was denied access to forms other behavioral clinicians used to perform their services. She also alleges that AWS retaliated against her and terminated her after she

complained about not being provided with the proper forms. (Dep. of Jones at pp. 49-50).

When asked the basis for her allegations that she was denied forms because of her race or national origin, Jones was unable to provide an explanation of her claim:

Q.    Let me just tell you this way. You have alleged that one of the things that was done that was discriminatory, or retaliatory, against you by AWS, was the denial of these forms. Now, we have talked about the fact that you did receive them, at some point, but there was a delay.

So, what I am asking you is, regarding the denial of the forms, or the delay in your getting them, why you believe that race discrimination, or your color, or your place of natural origin, motivated the decisions not to provide you with these forms, or to delay providing them to you?

A.    Why do I think that the basis for him not providing the forms had to do with racial discrimination?

Q.    Race, or the fact that you are Jamaican, or black, or African-American, or whatever, why do you think that has anything to do with that?

A.    I don't think I can answer that question.

Q.    In any of your conversations with Mr. Titus, either on the telephone, in person, by e-mail, did race, or your place of origin, or your color ever come up?

A.    No, it did not.

Q.    Did you ever hear any comments made by Mr. Titus to anyone else, about you, or about anyone else that was Jamaican, African-American, black, any kind of inappropriate comments made by him?

A.    No.

Q.    Anyone else, any other employee, manager, supervisor at AWS, ever make any remarks of a racial nature to you, or directed towards you?

A.    No specifically anything to do with race, no.

Q.    Or the fact that you were born in Jamaica, or your color, or that you were African-American?

A.    No. (Dep. of Jones at pp. 54-55)

In order to pursue a discrimination claim under Title VII, Jones must establish the existence of an employer-employee relationship between herself and AWS. It is well-settled that independent contractors are not protected by Title VII. <u>Vakharia v. Swedish Covenant Hospital</u>, 190 F.3d 799, 806 (7th Cir. 1999), cert. denied, 530 U.S. 1204 (2000); <u>Alexander v. Rush North Shore Medical Center</u>, 101 F.3d 487, 492-493 (7th Cir. 1996), cert. denied, 522 U.S. 811 (1997); <u>Knight v. United Farm Bureau Mutual Insurance Co.</u>, 950 F.2d 377, 380 (7th Cir. 1991).

The best evidence of Jones' independent contractor status is contained within the plain language of the Agreement itself. Jones is identified as, and signed the Agreement as, an independent contractor. The term "independent contractor" is used on numerous occasions throughout the 2-page document. By signing the Agreement Jones acknowledged its contents and cannot now be heard to claim she thought she was an employee of AWS.

In addition, to determine whether a business relationship is one of independent contractor or one of employer-employee, the Seventh Circuit applies an economic realities test. <u>Knight</u>, 950 F.2d at 380. The following five factors are evaluated:

> (1) The extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of school required, including whether schools are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) the method in form of payment and benefits, and (5) the length of job commitment and/or expectations. <u>Worth v. Tyer</u>, 276 F.3d 249, 263 (7th Cir. 2001).

AWS contends that it did not exercise control and supervision over Jones' work. AWS states that the plain language of the Agreement speaks for itself. That is, Section 3 provides that "AWS will not exercise control or discretion over the manner or methods by which Independent Contractor provides services and otherwise performs its obligations." AWS takes the position

that Jones had complete control over the manner in which she provided services to those individuals referred to her by AWS. Moreover, Jones was working for other entities as a behavioral clinician while she was under contract with AWS, another factor indicative of AWS's lack of control and supervision over Jones.

Jones argues that AWS exercised "considerable" control and supervision over her work because she was required to submit documentation for review, had to complete forms, and underwent training. Jones cites no case for the proposition that any of these factors transform an independent contractor into an employee. Moreover, the <u>Knight</u> Court specifically held that even where independent contractors undergo training, they remain independent contractors and are not considered employees. <u>Knight</u>, 950 F.2d at 379. Moreover, "steps taken to 'monitor, evaluate, and improve the results of [the] work without supervision over the means by and manner in which he does his work, indicates that the worker is an independent contractor." <u>C.C. Eastern, Inc. v. National Labor Relations Board</u>, 60 F.3d 855, 858 (D.C.Cir. 1995). Likewise, attending meetings does not create an employment relationship. <u>Dixon v. Burman Co.</u>, 593 F.Supp. 6, 12 (N.D.Ind. 1983), <u>aff'd</u>, 742 F.2d 1459 (7th Cir. 1984) (requirement that insurance agent attend weekly meetings was insufficient to create employment relationship). Clearly, this factor weighs against Jones and in favor of AWS's position that Jones was an independent contractor.

AWS next argues that Jones' skills were not obtained from AWS. Jones is an educated professional with years of experience in her chosen field of psychology long before she became associated with AWS. Her occupation and the nature of the skills required is evidence that she is an independent contractor. <u>Knight</u>, 950 F.2d at 381. In addition, according to Comment h of Restatement (Second) Agency §220(2) (1957), work which requires the services of one that is

highly educated can often be indicative of an independent contractor relationship, as compared to work that is routine, highly supervised, or of a considerable duration, which is more likely to be that of an employer/employee relationship.

Although Jones argues that she was required to undergo orientation and attend universal precautions training, the cases cited in the prior section plainly demonstrate that attending such training does not convert an independent contractor into an employee. It is undisputed that Jones developed her skills long before she contracted with AWS. Highly skilled positions where the skills are learned outside of a job setting are considered independent contractor positions. Knight, supra. This economic realities factor does not favor Jones.

With respect to the third factor, responsibility for the costs of operation, Jones concedes that she was not responsible for the costs of operating AWS and that she was paid in a manner consistent with an independent contractor relationship. (Response Brief at 12).

The fourth factor, which considers the method and form of payment and benefits, also favors AWS. Jones has failed to discuss this factor, but AWS points out that this factor weighs against Jones because it is undisputed that she had no amounts deducted from her checks for income taxes or social security purposes. She was not provided benefits. Jones concedes that payments made by AWS were reported on a form 1099 as independent contractor payments. The manner in which Jones was paid indicates an independent contractor relationship. Aymes v. Bonelli, 980 F.2d 857, 862-63 (2nd Cir. 1992).

The last factor considers the length of job commitment and/or expectations. AWS argues that Jones was retained to provide certain limited services to AWS. This limited relationship suggests that no employer-employee relationship existed. EEOC v. North Knox School Corp.,

154 F.3d 744, 750 (7th Cir. 1998). Also, the fact that Jones was eligible for and took other work while working for AWS is strongly indicative of an independent contractor relationship. <u>Kirk</u>, 188 F.3d at 1008.

Jones argues that as the Agreement contains no time limitations, a reasonable inference existed that she would remain employed on a long term basis. However, courts have held that the fact that a party may terminate an independent contractor agreement upon 30 days' notice supports the finding that the plaintiff is an independent contractor. <u>Knight</u>, 950 F.2d at 379. Moreover, it is undisputed here that Jones performed other work in addition to working for AWS under the Agreement, another factor strongly indicative of an independent contractor relationship. <u>Kirk v. Brown Co.</u>, 188 F.3d 1001, 1008 (7th Cir. 1999). This economic realities factor does not favor Jones.

It is clear that under the economic realties test, Jones was not AWS's employee. She was an independent contractor and therefore cannot pursue any claims under Title VII.

AWS next argues that Jones' national origin claim is not actionable under Section 1981, and Jones has conceded this claim.

Jones has also brought a race discrimination claim under Section 1981.  To prove race discrimination under Section 1981, Jones must show intentional discrimination either by direct evidence or by indirect evidence through the burden of shifting analysis established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S. 133 (2000). Regardless of whether Jones proceeds under the direct or burden shifting method, the standard is ultimately the same – she must demonstrate that AWS would not have terminated her Agreement but for her race. <u>See</u> <u>Cerutti v. BASF Corp.</u>, 349 F.3d

1055, 1061-62 (7th Cir. 2003). AWS points out that it is entitled to an inference that the decision to terminate the Agreement was not due to Jones' race or national origin because Titus made the decision to hire Jones and also signed the letter terminating the Agreement. Under the common actor presumption, an inference of nondiscrimination arises when the plaintiff is already in the protected class and the same person does the hiring and firing. See e.g., Ritter v. Hill 'N Dale Farm, Inc., 231 F.3d 1039, 1044 (7th Cir. 2000); EEOC v. Our Lady of Resurrection Medical Center, 77 F.3d 145, 152 (7th Cir. 1996).

To prevail under the indirect method, Jones must first establish a prima facie case of race discrimination. Failure to establish any of the elements of the prima facie case defeats her discrimination claim. Bio v. Fed. Express Corp., 424 F.3d 593, 596 (7th Cir. 2005). If Jones establishes a prima facie case, the burden shifts to AWS to articulate a legitimate, non-discriminatory reason for its business decision. Johnson v. City of Fort Wayne, 91 F.3d 922, 931 (7th Cir. 1996). Jones can then avoid summary judgment only if she can establish that AWS's reasons are pretextual. Id. Pretext means "a lie, specifically a phony reason for some action." Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995).

Direct evidence is evidence that proves discriminatory conduct "without reliance on inference or presumption." Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003). Jones can present no direct evidence of race discrimination. Therefore, Jones must attempt to prove her case through the McDonnell Douglas burden shifting analysis.

To prove her prima facie case, Jones must first establish that: (1) she belongs to a protected group; (2) she was performing her job satisfactorily; (2) she suffered an adverse employment action and (4) AWS treated similarly-situated independent contractors outside her

protected class differently or more favorably. McDonnell Douglas, 411 U.S. at 802; Johnson, 91 F.3d at 931. Without a prima facie case, Jones cannot withstand summary judgment. Gilty v. Village of Oak Park, 919 F.2d 1247, 1250 (7th Cir. 1990)

As an African-American, Jones is a member of a protected group, and by virtue of the termination of the Agreement, she suffered an adverse employment action. AWS argues, however, that her inability to show that AWS treated similarly situated independent contractors-behavioral clinicians more favorably defeats her race discrimination claim at the prima facie stage.

A similarly situated employee, or in this case independent contractor, is one who is "directly comparable to [Jones] in all material respects." Atanus v. Perry, 520 F.3d 662, 673 (7th Cir. 2008); Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002); that is, one who is substantially similar to with respect to performance, qualifications, and conduct. Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000). The comparator must also have the same job description. Ajayi v. Aramark Bus. Servs. Inc., 336 F.3d 520, 532 (7th Cir. 2003). Specifically, Jones must show that she and Caucasian independent contractors are comparable "in regard to performance, qualifications, and conduct," which "normally entails a showing that the [comparable independent contractor] dealt with the same supervisor, were subject to the same standards, and have engaged in similar conduct without differentiating or mitigating circumstances, as would distinguish their conduct or the . . .treatment of them." Anders v. Waste Management of Wisconsin, 463 F.3d 670, 676 (7th Cir. 2006). Jones must show that "members of the comparison group are sufficiently comparable to her to suggest that she was singled out for worse treatment." Pantoja v. American Antiana Bearing Manufacturing Corp., 495 F.3d 840,

845-46 (7th Cir. 2007)

AWS argues that Jones cannot identify an independent contractor-behavioral clinician who was similarly situated to her – namely an independent contractor-behavioral clinician who did not receive forms to perform his or her work, but whose Agreement was not terminated by AWS. As a result, contends AWS, Jones cannot establish her prima facie case, which is fatal to her §1981 claim.

Jones makes no effort to address the standards applicable to her burden of demonstrating that another individual is similarly situated. As noted, a similarly situated employee is one who is "directly comparable to [Jones] in all material respects. Atanus v. Perry, 520 F.3d 662, 673 (7th Cir. 2008).

Jones argues that she satisfies this element of her prima facie case because the other behavioral clinicians with independent contract agreements with AWS are Caucasian, they all had Titus as their supervisor, and they were all required to submit similar documentation. However, Jones has failed to establish that any of these individuals were similarly situated to her under the standards articulated by the Seventh Circuit. Jones has produced no evidence that any of these individuals were similarly situated with respect to "performance, qualifications and conduct" because Jones submits no evidence to establish that any of these individuals had a similar background or engaged in the same type of conduct as she did while working for AWS. Radue, 219 F.3d at 617. Jones identifies no independent contractor who allegedly did not receive forms to perform their work, but whose Agreement was not terminated by AWS. The Seventh Circuit has cautioned that, "in order to show that a co-worker is similarly situated to a terminated employee, the employee must show that the other co-worker had a 'comparable set of failings.'"

Burks v. Wisconsin Department of Transportation, 464 F.3d 744, 751 (7th Cir. 2006).  In addition, a Caucasian male behavioral clinician, Ace Jones, also had his Independent Contractor Agreement terminated. (Doc. 37-4 at p. 2). Thus, there is a non-minority behavioral clinician who was treated similarly to Jones. This evidence demonstrates that Jones' race played no part in the decision to terminate her Agreement.   As Jones cannot establish the fourth element of her prima facie case, AWS is entitled to summary judgment on the §1981 race discrimination claim.

Even if the Court were to determine that Jones has established a prima facie case of race discrimination, summary judgment in AWS's favor remains appropriate because AWS had a legitimate, non-discriminatory reason for terminating the Agreement. The Agreement Jones signed permitted either party to cancel upon 30-day notice. AWS simply exercised its contractual right to cancel the Agreement. Jones possesses no evidence that this business decision was merely a pretext for race discrimination.

A pretext analysis is not required where, as is the case here, Jones fails to prove a prima facie case of discrimination. Cerruti, 349 F.3d at 1061. Even so, under such an analysis, Jones can offer no evidence to prove that AWS's legitimate reason for terminating her Agreement was a pretext for unlawful discrimination.

Pretext does not, "in ordinary language or the law, mean a mistake." Russell, 51 F.3d at 68; Nawrot v. CPC Int'l, 277 F.3d 896, 906 (7th Cir. 2002) Pretext means "a lie, specifically a phony reason for some action." Tincher v. Wal-Mart Stores, Inc., 118 F.3d 1125, 1129-30 (7th Cir. 1997). Jones cannot satisfy this burden by simply showing that the reason given for the action taken was "not just, or fair, or sensible." Pignato v. American Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994). "The fact that the employer was mistaken or based its decision on bad

policy, or even just plain stupidity, goes nowhere as evidence that the proffered explanation is pretextual." Essex v. United Parcel Service, 111 F.3d 1304, 1309 (7th Cir. 1997). As the Seventh Circuit has stated, this Court "does not sit as a super-personnel department that reexamines an entity's business decisions." Dale, 797 F.2d at 464. Nor do courts determine whether the employer exercised prudent business judgment. Id. Rather, pretext addresses "whether the employer honestly believes in the reasons it offers." McCoy, 957 F.2d at 373.

Finally, although AWS need not come forward with further explanation as to the reasons for terminating Jones' Agreement, there were two factors which played a part in Titus' decision to terminate the Agreement. Titus is aware of Jones' allegation that he failed to provide her with forms on which she was to record and provide information about the services she provided to AWS clients/customers. According to Titus, there were no specific forms. Rather, behavioral clinicians are to submit monthly reports to Titus in order to show the work being performed on behalf of AWS clients/customers. In addition, monthly paperwork provided Titus with verification necessary for behavioral clinicians to be paid. (Affidavit of Titus at ¶3). Jones did not provide Titus with paperwork in a timely fashion. It would not have made any difference to Titus had Jones produced monthly reports on forms provided to her by AWS personnel, or on her own forms. It was more important to Titus that the monthly reports be provided to him on a timely basis. Jones did not do so. Titus decided to terminate Jones' Agreement because of her failure to turn in her paperwork on a timely basis. (Affidavit of Titus at ¶3). In addition, Titus received reports from clients/customers that they were not happy with the services being provided to them by Jones. (Affidavit of Titus at ¶4). This was an additional factor in Titus' decision to terminate the Agreement.  As AWS has shown its reasons for

terminating Jones were not pretextual, Jones' Section 1981 discrimination claim fails for this reason also.

The court will now address Jones' retaliation claim. Section 1981 prohibits parties to a contract from retaliating against one another for complaints of race discrimination. CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008); Stephens v. Erickson, 569 F.3d 779, 786 (7th Cir. 2009). Retaliation claims under §1981 require the same analysis as those under Title VIII. Stephens, 569 F.3d at 786. Under the indirect, burden-shifting analysis, Jones is required to offer evidence of a prima facie case by showing that (1) she engaged in a statutorily protected activity, (2) she met the other party's legitimate expectations, (3) she suffered an adverse action, and (4) she was treated less favorably than similarly situated independent contractors who did not engage in a statutorily protected activity. Moser v. Indiana Dep't of Corrections, 406 F.3d 895, 903 (7th Cir. 2005).

Here, even assuming Jones' complaints about not receiving proper forms constitutes statutorily protected activity, Jones cannot prevail on her retaliation claim because she possesses no evidence that she was treated less favorably than similarly situated independent contractor-behavioral clinicians who did not engage in a statutorily protected activity. As set forth in the prior section, Jones cannot satisfy the fourth prong of her prima facie case, which deals a fatal blow to her retaliation claim. Moreover, even if Jones somehow satisfies her prima facie case, AWS has articulated a legitimate non-discriminatory reason for its actions: The Agreement Jones signed permitted either party to cancel the Agreement upon 30-day notice. AWS simply exercised its contractual right to cancel the Agreement. Jones possesses no evidence that this business decision was merely a pretext for race discrimination.

The retaliation claim fairs no better under the direct method of proof. The direct method requires Jones to show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there is a causal link between the two. <u>Metzger v. Illinois State Police</u>, 519 F.3d 677, 681 (7th Cir.2008).

The most common manner of establishing a causal link between an adverse employment action and an employee engaging in protected activity is to show that the adverse action comes on the heels of the protected activity. <u>Filipovic v. K & R Exp. Systems, Inc.</u>, 176 F.3d 390, 398 (7th Cir. 1999). When there is a substantial lapse of time between the protected activity and the adverse action, this is counter-evidence of a causal connection. <u>Id</u>.

As applied here, Jones concedes she had all of the necessary forms in connection with her work as a behavioral clinician by December, 2007. Two months later, on February 4, 2008, AWS notified Jones in writing of its decision to terminate the Agreement and provided Jones with the requisite 30-day notice of the termination. Thus, termination of the Agreement did not "come on the heels" of the alleged protected activity. No reasonable jury could find that a gap of two months between the protected activity and the retaliation is sufficient temporal proximity to establish a causal link under the circumstances presented here. <u>Tomanovich v. City of Indianapolis</u>, 457 F.3d 656, 665 (7th Cir. 2006) (finding two month time period insufficient by itself to establish causal connection between statutorily protected activity and adverse employment action).

Jones cites several cases from outside of this jurisdiction holding that a two month period of time between the protected activity in the adverse job action is sufficient to establish retaliation. However, in doing so, Jones ignores Seventh Circuit precedent, which holds that a

two month time period is insufficient to establish a causal connection between the statutory protected activity and the adverse employment action. Tomanovich v. City of Indianapolis, 457 F.3d 656, 665 (7th Cir. 2006). In addition, a temporal proximity of six weeks between filing of an EEOC charge and plaintiff's termination is insufficient to establish retaliation. EEOC v. Yellow Freight Systems, 253 F.3d 943, 952-53 (7th Cir. 2001). See also, Baker v. Potter, 294 F.Supp.2d 33, 41 (D.D.C. 2003) (interval of two months held not to be sufficient to establish the temporal proximity necessary to show a causal connection); King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (stating that a two-month gap is "sufficiently long as to weaken significantly the inference of causation between the two events"). As a result, AWS is entitled to summary judgment on Jones' retaliation claim because the alleged retaliation did not occur "on the heels of" the allegedly protected activity.

Moreover, in order to prove the causal link, Jones "is required to show that the employer would not have taken the adverse action 'but for' the plaintiff's engagement in the protected activity." McKenzie v. Illinois Dept. of Transp., 92 F.3d 473, 483 (7th Cir. 1996). Jones cannot establish that "but for" her complaints about receiving forms and her treatment by Dr. Salon, the Agreement would not have been terminated. Titus sets forth in his Affidavit the reasons why he decided to terminate the Agreement. Jones has not presented any evidence that the reasons given were merely a pretext for retaliation.

The ultimate burden of persuasion always remains on the plaintiff to show that the employer intentionally discriminated against the plaintiff. Id., 509 U.S. at 511, 113 S.Ct. at 2749. Pretext exists where the reason given for the employment action taken was really a lie contrived to mask unlawful retaliation or discrimination. Wolf v. Buss (America) Ind., 77 F.3d 914, 919

(7th Cir. 1996), cert. denied, 519 U.S. 866, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). As long as an employer honestly believed in the proffered reason, the employee cannot prove pretext even if the employer's reason is "mistaken, foolish, trivial, or baseless." Kariotis v. Navistar Int'l Trans. Corp., 131 F.3d 672, 676 (7th Cir. 1997). Pretext "means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." Kulumai v. Blue Cross Blue Shield Association, 224 F.3d 681, 684 (7th Cir. 2000). Pretext "is not merely a mistaken or an imprudent reason; it is a false reason or a dishonest explanation, which, because of its falseness or dishonesty, raises a question as to whether the employer is hiding a discriminatory motive." Rice v. Indiana State Police, 149 F.Supp.2d 573, 581 (S.D.Ind. 2001).

There is simply no evidence of pretext in the present case. Accordingly, AWS is entitled to summary judgment on Jones' retaliation claim.

Conclusion

On the basis of the foregoing, AWS' motion for summary judgment [DE 31] is hereby GRANTED.

Entered: February 7, 2011.

s/ William C.  Lee
William C. Lee, Judge
United States District Court